**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                                              )
                                                              )
**CHRISTINE MORGAN,**                          )
**next friend and mother of minor, R.M.,**    )
                                                              )
              **Plaintiff,**                              )
                                                              )
         **v.**                                             )
                                                              )          **Civil Action No. 14-13781-DJC**
                                                              )
**TOWN OF LEXINGTON, LEXINGTON**   )
**PUBLIC SCHOOLS, PAUL ASH and**      )
**STEVEN FLYNN,**                              )
                                                              )
              **Defendants.**                          )
                                                              )
                                                              )
_____)

**<u>MEMORANDUM AND ORDER</u>**

**CASPER, J.**                                                              **September 24, 2015**

## I.    Introduction

Plaintiff Christine Morgan ("Morgan"), next friend and mother of the minor R.M., has filed this lawsuit against defendants Town of Lexington ("Lexington"), Lexington Public Schools ("LPS"), Superintendant Paul Ash ("Ash") and Principal Steven Flynn ("Flynn") (collectively, the "Defendants"), alleging a violation of R.M.'s substantive due process rights under the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 against all Defendants (Count I), negligence against all Defendants (Count II), intentional infliction of emotional distress against Ash and Flynn (Count III), negligent infliction of emotional distress against Ash and Flynn (Count IV), negligent hiring, training and supervision against Lexington and LPS (Count V) and violations of the Massachusetts Civil Rights Act, Mass Gen. L. c. 12, §§ 11H, I against all

1

Defendants (Count VI).  D. 1.  Morgan has moved to amend her complaint to add a hostile environment claim based on sexual harassment and discrimination pursuant to Title IX, 20 U.S.C. § 1681.  D. 15.  The Defendants have moved to dismiss the original complaint, D. 6, and oppose the amendment, D. 19.  For the reasons stated below, the Court ALLOWS the Defendants' motion to dismiss and DENIES Morgan's motion to amend.

## II.    Standard of Review

In considering a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), the Court must determine if the facts alleged "plausibly narrate a claim for relief."  Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (citation omitted).  This determination requires a two-step inquiry.  García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013).  First, the Court must distinguish the factual allegations from the conclusory legal allegations in the complaint.  Id.  Second, taking the Plaintiff's allegations as true, the Court should be able to draw "the reasonable inference that the defendant is liable for the misconduct alleged."  Id. (quoting Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011)).

The Court will dismiss a pleading that fails to plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  To state a plausible claim, a claim need not contain detailed factual allegations, but it must recite facts sufficient to at least "raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Twombly, 550 U.S. at 555.  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 555).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  Id. (quoting Twombly, 550 U.S. at 557) (alteration in

2

original).  At bottom, a claim must contain sufficient factual matter that, accepted as true, would allow the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  However, "[i]n determining whether a [pleading] crosses the plausibility threshold, 'the reviewing court [must] draw on its judicial experience and common sense.' . . . This context-specific inquiry does not demand 'a high degree of factual specificity.'"  García-Catalán, 734 F.3d 100, 103 (1st Cir. 2013) (internal citations omitted).

## III.   Factual Allegations

These facts are as stated in the complaint, D. 1, and are accepted as true for the purpose of the motion to dismiss.  R.M. has attended Lexington Public Schools since he was five years old.  Id. ¶ 7.  At all times relevant to this action, Defendant Ash was the superintendent of the Lexington School District.  Id. ¶ 4.  Beginning in September 2010, R.M. was a student at Jonas Clarke Middle School ("Clarke"), where Defendant Flynn served as the principal.  Id. ¶¶ 5, 8.

On or about October 5, 2011, when R.M. was twelve years old, he sustained injuries as a result of a physical assault on school grounds by several other students at Clarke referred to in the complaint as members of the "Kool-Aid Club."  Id. ¶¶ 13-16.  Morgan alleges multiple students, teachers and staff witnessed the assault.  Id. ¶ 18. Morgan further alleges the assault was recorded on a student's cell phone and that the video was later provided to school administrators.  Id. ¶ 19.

Thereafter, Morgan left a message for Flynn informing him of the incident, notifying him that R.M. had been the victim of bullying and that she was concerned for his safety.  Id. ¶¶ 22-23.  As some point later that day, based on a lack of response from Flynn, Morgan called the school again and left a message for Assistant Principal Jennifer Turner ("Turner").  Id. ¶ 24. The next day, October 6, 2011, Flynn returned Morgan's call while he had another student present in

his office.  Id. ¶ 25.  Flynn told Morgan that R.M. had not "told the whole story" and that R.M. had initially agreed to the assault to become a member of the "Kool-Aid Club."  Id. ¶¶ 25-26. He also indicated the school administration had a video of the assault.  Id. ¶ 27.  Flynn stated that R.M. was not in trouble as he had not "been the aggressor," but that Flynn "was not happy with R.M. for delaying the investigation."  Id. ¶ 28.  As a result, Flynn banned R.M. from running in a track meet scheduled for later that day.  Id. ¶ 29.

Morgan alleges that Flynn's refusal to acknowledge that bullying had occurred and the punishment of being banned from the track meet deterred R.M. from reporting subsequent incidents of bullying.  Id. ¶ 30.  On October 11, 2011, R.M. told Morgan he feared retaliation for reporting the bullying.  Id. ¶ 35.  Because of this, Morgan met with Taylor and another assistant principal, Anna Monaco ("Monaco"), to explain that she and R.M. were afraid for his safety.  Id. ¶¶ 35-36.  Morgan alleges Monaco was confrontational and stated R.M. had "invited" the assault based on a video that had been provided to the administration.  Id. ¶¶ 39-40.

The complaint alleges that as a consequence of the administration's indifference, R.M. was assaulted and verbally harassed by the students who previously assaulted him in retaliation for "getting them in trouble."  Id. ¶¶ 44-47.  R.M. immediately reported this to Turner.  Id. ¶ 48. Turner instructed R.M. to move away from the group of students.  Id. ¶ 49.

Thereafter, R.M.'s pants were pulled down, on multiple occasions and in front of other students, by the same group involved in the earlier incident.  Id. ¶ 53.  R.M. was also "table topped," in which two students pushed R.M. from opposite directions so that he fell backwards. Id. ¶ 54.  R.M. was repeatedly called "Mandex Man," "thunder thighs" and hungry hippo."  Id. ¶ 56.  The complaint further alleges that R.M. was repeatedly pushed, tripped, punched or verbally

assaulted while walking in school hallways.  Id. ¶ 55.  On December 21, 2011, R.M. was pushed into a locker, breaking his watch.  Id. ¶ 62.

The next day, Morgan emailed Flynn to explain that R.M. did not feel safe at school and that he was afraid to report the bullying because he experienced retaliation when he reported similar conduct earlier in the year.  Id. ¶¶ 63-65.  Flynn replied that he could not investigate the allegations unless R.M. reported the bullying himself, id. ¶ 66, although Lexington's Bullying Prevention Plan indicated parents could report bullying incidents.  Id. ¶ 68.  On December 23, 2011, Morgan met with Turner to report the list of incidents R.M. had provided.  Id. ¶ 75.  The complaint alleges Turner did not record any of these incidents or the names of the alleged participants and that no investigation or remedial action was taken.  Id. ¶¶ 76-80.  The two agreed that if R.M. did not feel safe attending school following the holiday break, that Turner and the school social worker Mia Brousse ("Brousse") would visit the Morgan residence to discuss the matter.  Id. ¶ 82.

When school began on January 2, 2012, R.M. refused to attend due to fear of being bullied.  Id. ¶ 84.  The next day Morgan informed Turner and Brousse and discussed the visit to the Morgan residence.  Id. ¶ 85.  Flynn maintained that the school could not investigate the bullying allegations unless R.M. personally reported the incidents.  Id. at ¶ 86.  The following day, January 4, 2012, when R.M. again was not at school, Flynn dispatched two Lexington police officers, who were not told that R.M. refused to attend school due to his fear of bullying, to the Morgan residence.  Id. ¶¶ 87-88, 91.  R.M. viewed the visit from police as a threat by Flynn to intimidate and coerce him to return to school.  Id. ¶ 89.

That day, Morgan emailed Flynn to complain that R.M. was being "treated as the wrongdoer."  Id. ¶ 94.  She explained that while she realized Flynn felt that R.M. should come to

school and provide details of the events, she believed she had "provided enough preliminary information for an investigation to have been initiated."  <u>Id.</u>  She further provided that it had taken weeks for R.M. to discuss some of the treatment, particularly "having his pants pulled down outside the school, in front of a girl."  <u>Id.</u> ¶ 95.  She explained that being asked to repeat the conduct was "exacerbating [R.M.'s] anxiety, reinforcing the humiliation and making him even more upset."  <u>Id.</u>  She concluded by inquiring as to whether any investigation had occurred and indicating that she was not aware of any efforts to ensure R.M.'s safety.  <u>Id.</u> ¶ 96.  On January 5, 2012, the same Lexington police officers visited the Morgan residence again to continue the previous day's conversation.  <u>Id.</u> ¶ 97.  This caused R.M. to have a panic attack, causing him to be unable to speak with the police officers.  <u>Id.</u> ¶ 98.

The next day, January 6, 2012, Morgan and R.M. met with Turner and Brousse.  <u>Id.</u> ¶ 100.  R.M. attempted to report the specific incidents but Turner told him they "did not have time" to discuss the specific details of the allegations.  <u>Id.</u> ¶ 101.  On January 9, 2012, after multiple attempts to schedule a meeting, R.M. reported his experiences to Flynn in a meeting in which Morgan was also present.  <u>Id.</u> ¶102.  The complaint alleges that Flynn said the incidents were "not even bullying" and threatened R.M. that he needed to return to school.  <u>Id.</u> ¶¶ 103-04.

On January 11, 2012, Dr. Mimi Thein diagnosed R.M. with acute stress reaction bordering on Post Traumatic Stress Disorder ("PTSD").  <u>Id.</u> ¶ 107.  On January 18, 2012, Morgan and her husband met with Flynn, Turner and Monaco, where they were told that no investigation of R.M.'s treatment had occurred.  <u>Id.</u> ¶¶ 108-10.  Despite Flynn's indication that he did not feel it was necessary to investigate, Morgan insisted that the administration conduct a thorough investigation pursuant to the Bullying Prevention Plan.  <u>Id.</u> ¶ 112.  Two days later, on January 20, 2012, Flynn told Morgan that he had investigated the "more serious" allegations by

6

R.M., and found that the student who allegedly pulled down R.M.'s pants admitted to doing so on school grounds as well as in the Lexington town center, id. ¶¶ 114-15, 117, and that other students confirmed that R.M. had been "table-topped." Id. ¶ 116. At this meeting Flynn told Morgan that none of the students who admitted to harassing and assaulting R.M. would be disciplined. Id. ¶ 118.

The complaint alleges that following this investigation, R.M. returned to school where he continued to experience harassment and bullying. Id. ¶ 120. On February 27, 2012, R.M. discovered a Facebook group entitled "I hate R.M.," which was liked by students at Clarke and at other neighboring schools. Id. ¶ 123. The group was created prior to the October 5, 2011 assault. Id. ¶ 124. Despite notifications to Flynn and Ash, the complaint alleges the Defendants did not take any action. Id. ¶¶ 125-26.

On February 29, 2012, the Morgans enrolled R.M. in a private school for the remainder of the year. Id. ¶¶ 127-28. R.M. began his eighth-grade year at a different private school but reenrolled at Clarke on October 9, 2012. Id. ¶¶ 133-34. He continued to experience anxiety and, as a result, missed 112 days of school that year. Id. ¶¶ 135-36. On April 25, 2013, Morgan wrote a letter to Superintendant Ash requesting a meeting. Id. ¶ 137. She indicated that she was not aware of any investigation by either the Clarke administrators or the police. Id. ¶ 139. She further explained that because of the failure to investigate, R.M.'s doctor and therapist's ability to assess R.M.'s needs were hampered. Id. ¶ 140. Ash did not respond to Morgan's letter. Id. ¶ 141.

On May 14, 2013, R.M. underwent a Functional Behavioral Assessment ("FBA") conducted by a behavioral specialist employed by LPS. Id. ¶ 142. This specialist, Carmen Susman ("Susman"), noted that R.M. had been diagnosed previously with PTSD. Id. ¶ 144. The

complaint alleges that Susman was instructed by Dr. Beverly Hegedus ("Dr. Hegedus"), a student services supervisor, to remove the PTSD diagnosis from Susman's FBA report to avoid potential liability.  Id. ¶ 145.

The complaint further alleges that the Defendants affirmatively encouraged, supported and/or condoned the harassment by failing to take prompt and effective steps to alleviate it, intentionally protecting the students who bullied R.M., failing to properly train staff, failing to notify all school employees of the harassment, imposing minimal remedial measures and intentionally delaying the remediation by tampering with documentation.  Id. ¶¶ 154-55.

## IV.    Procedural History

Morgan instituted this action on October 3, 2014.  D. 1.  Defendants have now moved to dismiss.  D. 6.  Morgan has also moved to amend her complaint to add a Title IX claim, D. 15, which the Defendants oppose.  D. 19.  The Court heard the parties on the pending motions and took these matters under advisement.  D. 21.

## V.    Discussion

### A.    Substantive Due Process (Count I, against all Defendants)

Morgan contends the Defendants violated the Constitution by depriving R.M. of his liberty interest in bodily integrity.  D. 1 ¶ 158.  "[O]rdinarily a state's failure to intervene to prevent harm to an individual by a private actor is not a constitutional violation."  Hasenfus v. LaJeunesse, 175 F.3d 68, 71 (1st Cir. 1999) (citing DeShaney v. Winnebago County Dept. of Soc. Servs., 489 U.S. 189 (1989)).  "[A] State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause," DeShaney, 489 U.S. at 197, because "the purpose of the Due Process Clause is to protect the people from the state,

not to ensure that the sate protects them from each other." <u>Rivera v. Rhode Island</u>, 402 F.3d 27, 34 (1st Cir. 2005).

In <u>DeShaney</u>, however, the Supreme Court suggested "that when the state creates the danger to an individual, an affirmative duty to protect might arise." <u>Rivera</u>, 402 F.3d at 35 (citing <u>DeShaney</u>, 489 U.S. at 201). In other words, the due process clause may be implicated where "the state . . . played a role in creating the danger or . . . enhanced the danger to an individual. <u>Id.</u> The First Circuit has discussed this state-created danger theory, but has not squarely accepted it, noting that it has not been presented with facts supporting an actionable claim. <u>Id.</u>

Assuming the First Circuit recognizes the state-created danger theory, to demonstrate substantive due process liability, a plaintiff must point to "behavior so extreme as to shock the conscience." <u>Hasenfus</u>, 175 F.3d at 72 (internal quotation marks omitted). "[T]his means conduct that is truly outrageous, uncivilized, and intolerable." <u>Id.</u> The conduct at issue must exhibit "an extreme lack of proportionality, as the test is primarily concerned with violations of personal rights so severe[,] so disproportionate to the need presented, and so inspired by malice or sadism rather than merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." <u>González-Fuentes v. Molina</u>, 607 F.3d 864, 881 (1st Cir. 2010) (internal alterations and quotation marks omitted).

In <u>Hasenfus</u>, the First Circuit upheld the dismissal of a substantive due process claim against a school district when a teacher failed to prevent the suicide attempt of a student who had previously been raped. <u>Hasenfus</u>, 175 F.3d at 73, 74 (teacher's public reprimand of student and banishment to unsupervised locker room did not shock the conscience, even with knowledge of recent sexual assault and testimony against rapist). As stated by another court in this district, the

First Circuit has "recognized that a school has no general duty to protect students, and might only have a specific duty to protect a student in situations where inaction and failure to protect the student would be truly outrageous, uncivilized, and intolerable under the circumstances." Morgan v. Driscoll, No. 98-10766-RWZ, 2002 WL 15695, at *4 (D. Mass. Jan. 3, 2002) (granting summary judgment to school defendants when complaint alleged they failed to adopt and implement effective policies to combat racial harassment, including employee training, and failed to protect a minor plaintiff from verbal and physical harassment) (quotations omitted).

Here, Morgan contends the defendants caused a "state-created danger" by preventing R.M. from participating in a track meet, D. 1 ¶ 29, which Morgan characterizes as discipline for reporting the bullying; dispatching the Lexington Police officers to the Morgan's residence, id. ¶ 87-89; telling R.M. that he needed to return to school, id. ¶¶ 103-04, which Morgan characterizes as "threatening him on multiple occasions," D. 16 at 12; Turner and Brousse stating that they "did not have time" to discuss the specific incidents of bullying at the January 6, 2012 meeting, id. ¶ 101, which Morgan characterizes as discouraging him from reporting subsequent acts of bullying; and allegedly altering R.M.'s diagnosis in his student record, id. ¶ 145, which Morgan alleges was an attempt to avoid potential liability. D. 16 at 12.

Accepting all of Morgan's allegations as true, these facts do not give rise to a substantive due process violation. Without diminishing R.M.'s experience, the conduct in this context cannot be characterized as "truly outrageous, uncivilized, and intolerable." Hasenfus, 175 F.3d at 72. Although the Defendants' lack of responsiveness and concern to R.M.'s treatment by fellow students may have been negligent, "[e]ven where the government has created or markedly increased a risk of harm, no violation of substantive due process occurs unless the 'behavior [is] conscience-shocking or outrageous.'" Willhauck v. Town of Mansfield, 164 F. Supp. 2d 127,

135 (D. Mass. 2001) (quoting Hasenfus, 175 F.3d at 73).  Here, there was no conduct on the part

of school administrators so outside the realm of reasonableness as to shock the conscience.  See

Johnson v. Prospect Mountain JMA Sch. Dist. SAU 301, No. 13-CV-207-LM, 2014 WL

2588952, at * 2, 6 (D.N.H. June 9, 2014) (dismissing substantive due process claim based on

verbal abuse, unequal discipline and disrespectful comments by basketball coach and teacher

because "[f]ailing to properly investigate parental complaints and failing to keep those

complaints confidential are not such stunning or egregious acts that they shock the conscience").

"Merely alleging state actions which render the individual more vulnerable to harm, under a

theory of state created danger, cannot be used as an end run around DeShaney's core holding"

that "a State's failure to protect an individual against private violence simply does not constitute

a violation of the Due Process Clause." Rivera, 402 F.3d at 38 (holding that substantive due

process rights of murder witness, who was killed on the orders of the murderer, were not violated

by police who failed to protect her after promising to do so).

    Morgan cites Doe v. Taylor Indep. Sch. Dist., 975 F.2d 137 (5th Cir. 1992), rev'd in part

on other grounds, 15 F.3d 443 (5th Cir. 1994), to argue that liability attaches "when the student

shows that the official, by action or inaction, demonstrates a deliberate indifference to his or her

constitutional rights." D. 16 at 11 n.3.  Morgan's reliance on Doe is misplaced.  Doe had been

sexually molested by a state-employed school teacher, not by a private party. Id. at 139-40.  The

Fifth Circuit held that the student had a constitutional right to be free from molestation by a state

actor and that the superintendent and principal also had a constitutionally based duty to protect

her from such conduct. Id. at 142-43.  The Court thus enforced the duty of school officials to

protect a student from "an assault on the student[']s[] constitutional rights" by another school

official.  Id. at 141.  In contrast, Morgan urges a duty of school officials to protect a student from private violence.  Doe does not stand for this proposition, which is contradicted by DeShaney.

Morgan also argues that she is entitled to an unspecified negative inference from the allegation that Susman removed R.M.'s PTSD diagnosis from the FBA.  D. 16 at 15-16.  This argument relies upon the principle that "a trier of fact may (but need not) infer from a party's obliteration of a document relevant to a litigated issue that the contents of the document were unfavorable to that party."  Testa v. Wal-Mart Stores, Inc., 144 F.3d 173, 177 (1st Cir. 1998).  Accepted as true, the allegation that Susman removed the diagnosis from R.M.'s FBA report and that the diagnosis reflected PTSD, however, does not support the inference implied by Morgan -- that R.M.'s substantive due process rights were violated by actions and inactions of Ash and Flynn with respect to the alleged bullying.  Accordingly, Morgan's substantive due process claim cannot proceed.

### B.      MCRA (Count VI, against all Defendants)

Although Morgan brings her MCRA claim against all Defendants, "under Massachusetts law a municipality cannot be sued under the MCRA."  Kelley v. LaForce, 288 F.3d 1, 11 n.9 (1st Cir. 2002).  Therefore, the Court analysis proceeds only as against Flynn and Ash.  Mass. Gen. L. c.12 § 11I provides, "[a]ny person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with, as described in section 11H" may seek redress under the act.  The MCRA, Mass. Gen. L. c.12 § 11H, prohibits interference via "threats, intimidation or coercion," or attempt thereof.

"The [MCRA] and 42 U.S.C. § 1983 are parallel statutes and have been interpreted as coextensive, except that the MCRA does not require governmental action."  Driscoll, 2002 WL

15695, at *5.  Under both statutes, Morgan must demonstrate that Flynn and Ash "caused [R.M.] to be deprived of his constitutional rights."  Id.  Because the Court concludes that R.M. was not denied substantive due process, discussed above, the Defendants are entitled to summary judgment on Count VI as well.

### C.     Negligence Counts (Count II, against all Defendants; Count IV, against Ash and Flynn; and Count V, against Lexington and LPS)

As a preliminary matter, the Massachusetts Tort Claims Act ("MTCA") provides that no public employee "shall be liable for any injury or loss of property or personal injury or death caused by his negligent or wrongful act or omission while acting within the scope of his office or employment."  Mass. Gen. L. c. 258 § 2.  Thus, to the extent Morgan brings negligence claims against Flynn and Ash, those claims must be dismissed.

As to Lexington and LPS, presentment was a condition precedent to Morgan's negligence claims and had to "be made 'in strict compliance with the statute.'"  Gilmore v. Commonwealth, 417 Mass. 718, 721 (1994) (quoting Weaver v. Commonwealth, 387 Mass. 43, 47 (1982)).  The presentment requirement is set forth in Mass. Gen. L. c. 258, § 4, providing "[a] civil action shall not be instituted against a public employer on a claim for damages under this chapter unless the claimant shall have first presented his claim in writing to the executive officer of such public employer within two years after the date upon which the cause of action arose."  The purpose of the requirement is to provide notice of the claim and to allow the public employer to investigate and consider settlement.  Carifio v. Town of Watertown, 27 Mass. App. Ct. 571, 576 (1989).  All actions based on the MTCA are subject to the presentment requirement unless specifically exempted by statute.  Fearon v. Commonwealth, 394 Mass. 50, 53 (1985).

The Defendants argue that Morgan failed to comply with the MTCA's presentment requirement.  D. 7 at 16-18.  The Defendants contend that the presentment letter, dated August

21, 2014, was sent well over two years from the date of the first alleged assault on October 17, 2011 and also more than two years after the date of the last bullying allegation on February 27, 2012. Id. at 17.   In response, Morgan points to two incidents — the alleged instruction to remove R.M.'s PTSD diagnosis from the FBA on May 14, 2013 and R.M.'s absences from school during the 2013-2014 school year — to show presentment was timely. D. 16 at 17.  Even accepting Morgan's factual allegations as true, neither incident is sufficient to toll the two-year presentment period, which began on February 27, 2012, the date of the last bullying allegation.

To the extent that Morgan argues that Dr. Hegedus and Susman's actions with respect to the PTSD report in R.M.'s FBA should toll the two-year presentment requirement under a continuing tort theory, Massachusetts case law holds to the contrary.  White's Farm Dairy, Inc. v. De Laval Separator, Co., 433 F.2d 63, 67 (1st Cir. 1970); see Church v. General Elec. Co., 138 F. Supp. 2d 169, 175-76 (D. Mass. 2001) (holding that the continuing tort doctrine applied to nuisance and trespass claims); Vander Salm v. Bailin & Assocs., Inc., No. 11-40180-TSH, 2014 WL 1117017, at * 6 (D. Mass. Mar. 18, 2014) (noting that "[a]ny tolling of actions in Massachusetts under the continuing tort doctrine is limited to claims of nuisance and trespass").

Morgan also asserts that the presentment requirement is satisfied because, "as a result of the debilitating fear, anxiety and PTSD, R.M. missed 112 days of school from October 9, 2012 through the remainder of the school year."  D. 16 at 17.  A continuing tort, however, even if it could toll the presentment period, "[cannot be] established by the continuation of harm caused by previous but terminated tortious or unlawful conduct."  Tomaselli v. Beaulieu, 967 F. Supp. 2d

423, 443 (D. Mass. 2013) (internal quotation marks omitted).  Accordingly, Counts II, IV and V are dismissed.[1]

> ### D.      Intentional Infliction of Emotional Distress (Count III, against Ash and Flynn)

To establish a claim for intentional infliction of emotional distress, Morgan is "required to show (1) that [the Defendants] intended, knew, or should have known that [their] conduct would cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct caused emotional distress; and (4) that the emotional distress was severe." Polay v. McMahon, 468 Mass. 379, 385 (2014).  As to Ash, the only conduct alleged is that he failed to respond to Morgan's letter.   D. 1 ¶ 141.  This conduct falls well short of the requirements to maintain a claim for intentional infliction of emotional distress.

As to Flynn, the Court concludes the conduct alleged does not rise to the level contemplated by the Massachusetts Supreme Judicial Court, conduct that "go[es] beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a civilized community." Id. at 386.  "The strength of a standard is always a matter of degree, but the Massachusetts cases are demanding." Kennedy v. Town Of Billerica, 617 F.3d 520, 530 (1st Cir. 2010).  "The extreme and outrageous conduct 'must be beyond all bounds of decency and . . . utterly intolerable in a civilized community.'" D'Agostino, 367 F. Supp. 2d at 173 (quoting Sena v. Commonwealth, 417 Mass. 250, 264 (1994)).

---

[1] To the extent that the alleged liability of Lexington and LPS with respect to Morgan's claim for negligent hiring, training and supervision (Count V) is based on the alleged unconstitutional actions of Ash and Flynn, the Court has concluded that Morgan has not stated a claim that Ash and Flynn violated R.M.'s constitutional rights.  Without such a constitutional violation by its employees, supervisory liability cannot be assigned to the employer.  See McQueen v. Beecher Cmty. Schools, 433 F.3d 460, 471 (6th Cir. 2006) (stating that "the determination that the school district's officials did not violate the plaintiff's constitutional rights resolves the claim [for supervisory liability] against the school district as well") (alterations and quotation marks omitted).

Several Massachusetts courts have recently addressed this claim in the school bullying context.  In Maclellan v. Dahlheimer, No. MICV-2011-02611-H, 2012 WL 6971005, at *2 (Mass. Super. Ct. Dec. 21, 2012), a mother alleged that a teacher treated her third-grade child "disparaging[ly]" and that the teacher's actions had encouraged other students to bully her child, resulting in "a page-long list of incidents."  Id. at *2.  The mother also alleged that both the teacher and the principal knew about the bullying, but took no action to stop it.  Id.  In fact, the principal reportedly told the son's parents that he "would not talk to them anymore and they should not bother calling him or leaving any messages at his office."  Id.  The principal also allegedly followed the child around "in a menacing way," "star[ed] and glar[ed] at him for no reason," and "made clear" to the child "that he did not want to hear any more complaints."  Id.  The court concluded that because the allegations only established that the defendants had "failed to stop bullying by other students" and that the teacher had "created an atmosphere conducive to . . . bullying . . . by the disparaging way she treated [the child]," the conduct was not "sufficiently extreme and outrageous" to constitute intentional infliction of emotional distress.  Id. at *3-4.  On the other hand, had the complaint "alleged that a school principal, or a third-grade teacher, was bullying an eight-year-old, such actions might satisfy the very high standard."  Id. at *3.

Similarly, in Parsons ex rel. Parsons v. Town of Tewksbury, No. 091595, 2010 WL 1544470, at *1 (Mass. Super. Ct. Jan. 19, 2010), the plaintiffs alleged that their middle-school child was bullied by his fellow students, at one point requiring multiple surgeries and hospital stays.  The school guidance counselor allegedly failed to respond to actual notice of the bullying, "failed to deter student intimidation, failed to make clear the consequences of bullying, and failed to employ community resources to prevent violence."  Id.  At one point, after a fight, the school behavior management facilitator told the child to "walk . . . off" his injuries.  Id.  The

court concluded that although defendants "appear to have mishandled and underestimated the seriousness of the situation," their conduct "was not, as a matter of law, beyond all bounds of decency and utterly intolerable in a civilized community." Id. at *4.

Here, Morgan's allegations focus on the Defendants' failure to act in preventing or remedying the bullying of R.M. by other students. Unfortunately, Massachusetts courts have found that this type of passive conduct is insufficient to state a claim. Maclellan, No. MICV-201102611H, 2012 WL 6971005, at *3 (Mass. Super. Ct. December 1, 2012); Doe v. Bradshaw, No. 11-11593-DPW, 2013 WL 5236110, at *13 (D. Mass. Sept. 16, 2013) (dismissing intentional infliction of emotional distress claim on a motion to dismiss against school officials in a case where the plaintiff alleged that they failed to investigate allegations of a coach's inappropriate sexual conduct with the plaintiff, failed to remedy peer harassment and failed to provide the plaintiff a free and appropriate public education).

"Even demonstration of 'malice,' without more, is insufficient to sustain a claim for intentional infliction of emotional distress." Bradshaw, 2013 WL 5236110, at *13. The only other conduct alleged that could conceivably be considered extreme is dispatching police officers to the Morgan's residence when he did not report to school and telling R.M. that his experience did not constitute bullying. While Flynn's conduct in doing so may have been misguided and insensitive, in the context it did not go beyond all possible bounds of decency, the high bar set by precedent for this claim. Therefore, the intentional infliction of emotional distress claim (Count III) must be dismissed.

### E.     Title IX Claim (proposed, Count VII)

Morgan moves to amend her complaint to add a claim of sexual harassment and discrimination based on hostile environment pursuant to Title IX.  D. 15.[2]  A motion for leave to amend a pleading is governed by Fed. R. Civ. P. 15(a)(2):  "a party may amend its pleading only with . . . the court's leave.  The court should freely give leave when justice so requires."  Leave to amend is "freely give[n]," but only after certain factors have been considered including but not limited to the futility of amendment.  Foman v. Davis, 371 U.S. 178, 182 (1962).

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  "The statute's enforcement mechanism includes an implied private right of action but this private right of action extends only to claims against the educational institution itself."  Rinsky v. Trustees of Bos. Univ., No. 10-10779-NG, 2010 WL 5437289, at * 12 (D. Mass. Dec. 27, 2010) (citing Lipsett v. University of P.R., 864 F.2d 881, 901 (1st Cir. 1988)) (internal citation omitted).  Therefore, as a preliminary matter, any claims against individual Defendants Ash and Flynn must be dismissed as a matter of law.

As to Lexington and LPS, "a hostile environment claim under Title IX requires acts of sexual harassment that are so severe and pervasive as to interfere with the educational opportunities normally available to students," and also that the municipal defendants acted with deliberate indifference toward known acts of harassment.  Santiago v. Puerto Rico, 655 F.3d 61, 73 (1st Cir. 2011).  In the context of student-on-student sexual harassment, "the plaintiff must show (1) that he or she was subject to 'severe, pervasive, and objectively offensive' sexual harassment by a school peer, and (2) that the harassment caused the plaintiff to be deprived of

---

[2] Morgan's amended complaint adds a Title IX claim but does not alter any of the factual allegations.  D. 15-1 ¶¶ 186-94.

educational opportunities or benefits." <u>Porto v. Town of Tewksbury</u>, 488 F.3d 67, 72 (1st Cir. 2007).  Liability of the district can attach only when it "(3) knew of the harassment, (4) in its programs or activities and (5) it was deliberately indifferent to the harassment such that its response (or lack thereof) is clearly unreasonable in light of the known circumstances." <u>Id.</u> at 73.

Morgan's proposed Title IX count alleges that R.M. was subjected to sex-based "bullying and harassment, includ[ing], *inter alia*, being sexually assaulted while at school." D. 15-1 ¶¶ 187.  The complaint alleges that "on multiple occasions R.M. had his pants pulled down in front of other students (male and female), while on school grounds" by a group of students who had previously assaulted him., <u>id.</u> ¶ 53, specifically that he was "pantsed" at dismissal allegedly only fifteen feet away from staff members and teachers, <u>id.</u> ¶ 57, and also once while waiting for the bus, <u>id.</u> ¶ 78.  The complaint alleges R.M. was called "Mandex Man," "thunder thighs" and "hungry hippo." <u>Id.</u> ¶ 56.  Morgan alleges that Flynn refused to discipline the students who engaged in this behavior and that following Flynn's investigation R.M. "continued to be harassed and bullied." <u>Id.</u> ¶ 120.

These allegations, even accepted as true, do not state a Title IX claim.  "Discrimination on the basis of sex is the *sine qua non* of a Title IX sexual harassment case, and a failure to plead that element is fatal." <u>Frazier</u>, 276 F.3d at 66.  Morgan must plead conduct "not merely tinged with offensive sexual connotations, but that actually constituted "*discrimina[tion]* ... because of ... sex." <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 81 (1998) (emphasis in original).  Morgan's Title IX claim boils down to the allegations that R.M.'s pants were pulled down on approximately three occasions, one of which was in front of a girl.  While humiliating and embarrassing, there are no allegations that these incidents were *because* of sex.  Moreover, Morgan's complaint does not advance any allegations that school officials failed to respond

adequately to the reports of harassment *because* of R.M's sex.  See Frazier, 276 F.3d at 67 (affirming dismissal of Title IX hostile environment claim when school officials failed to investigate incident of school disciplinary administrator watching student urinate because there was no allegation the conduct was of a sexual nature or because of sex and "[i]n the absence of conduct creating a sex-based hostile educational environment, laxity on the part of school officials in investigating an incident is not actionable under Title IX").  Accordingly, since it would be futile for Morgan to amend where her proposed amendment fails to state a Title IX claim, the Court denies the motion to amend.

## VI.     Conclusion

For the foregoing reasons, the Court ALLOWS the Defendants' motion to dismiss, D. 6, without prejudice.  The Court DENIES Morgan's motion for leave to amend her complaint, D. 15.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge